# J. ELROY McCAW AND JOHN D. KEATING *v.* THE TAX COMMISSIONER OF THE TERRITORY OF HAWAII, EARL W. FASE.

## NO. 2898.

ARGUED SEPTEMBER 8, 1952.  DECIDED MAY 14, 1953.

TOWSE, C. J., LE BARON, J., AND CIRCUIT JUDGE RICE IN PLACE OF STAINBACK, J., DISQUALIFIED.

PLEADING—*counterclaim—taxes—counterclaim is allowable in taxpayer's suit to recover other unpaid taxes under section 1575, Revised Laws of Hawaii 1945, together with penalty and interest.*

OPINION OF THE COURT BY CIRCUIT JUDGE RICE.

The issue for determination in this case has been as to the validity of assessments of taxes—also interest and penalties  with respect thereto—by the tax commissioner of the Territory of Hawaii, pursuant to chapter 101 of the Revised Laws of Hawaii 1945, upon gross receipts from radio broadcasting by a station, KPOA, having its situs in Honolulu and operating under license by the Federal Communications Commission.

The owners of KPOA have asserted—presented evidence in the court below and have cited authorities for the purpose of showing—that all radio broadcasting, and particularly all that of said station, is interstate commerce; that Congress has preempted the subject matter

of radio broadcasting to the exclusion of state and territorial taxation and the assessments made by the tax commissioner as aforesaid were unconstitutional and invalid.

On the other hand, the tax commissioner has alleged—and presented evidence in the court below for the purpose of showing—as the material facts, that the gross receipts assessed for taxation were derived from the transmission to the public in the Territory of Hawaii; that KPOA does not reach an audience outside the Territory of Hawaii with effective and satisfactory service that is of commercial significance in the sale of radio time; that sponsors purchasing radio time on KPOA have not done so with a view to reaching an audience outside the Territory of Hawaii; that to reach an audience without the Territory a short-wave relay must be employed; that the tax commissioner excluded from the tax assessments receipts from programs transmitted by short-wave relays; that the taxed receipts were from and the source thereof was the transmission of KPOA broadcasts to the radio audience in the Territory; and has cited authorities to show that the tax was lawful.

J. Elroy McCaw and John D. Keating, complainants, herein referred to as such, who, in copartnership, registered as such under the laws of the Territory of Hawaii and doing business under the name and style of Island Broadcasting Company, owned and operated KPOA, Honolulu,—instituted the action against the tax commissioner of the Territory of Hawaii—herein referred to as the tax commissioner—in the circuit court, first circuit, Territory of Hawaii, under law number 21340, pursuant to section 1475 of the Revised Laws of Hawaii 1945, and on May 3, 1951, therein filed an amended complaint, to recover the sum of $7,637.33 paid under protest on March 21, 1951.

The record in this court does not include the original complaint, so does not show when the suit was commenced; however, it is conceded by the tax commissioner that the suit was commenced within the period of thirty days after the protested payment, as provided by said section 1575.

The tax commissioner filed his answer interposing a general denial. He also filed a counterclaim asserting that for the period to and including July 31, 1950, the period involved—as shown by exhibit "B" of the amended complaint—he had made under said chapter 101 of the Revised Laws of Hawaii 1945 four assessments specified in the counterclaim; that the payment under protest covered one assessment and part of another; the counterclaim being for the balance of the partially paid assessment together with two small earlier assessments which also were unpaid.

Complainants filed a replication, interposing a general denial to the counterclaim and giving notice, under rule 4 of the said circuit court, first circuit, Territory of Hawaii, of intention to rely on the defenses of illegality and unconstitutionality.

Following denial by the trial court of a stay of proceedings in the application to this court for the writ of prohibition which was denied in number 2881, 39 Haw. 157, the case came on for trial, without jury, before and by Honorable Willson C. Moore, then judge of the fourth division of said territorial circuit court, and evidence was received January 3, 1952, to January 11, 1952, inclusive.

At the outset of the trial the parties had submitted to the trial court memoranda of law and the trial court heard argument on January 14, 1952. On January 15,

1952, the trial judge, from the bench, made pronouncements—since referred to as an "oral decision"—wherein he expressed conclusions determinative of the case in favor of the tax commissioner and against the complainants.

The trial judge had held that a material question for decision was as to the area in which the KPOA broadcasts had commercial value and ruled that this turned upon the area in which the broadcasts of the station were received with such intensity and dependability for pleasurable listening as to be of value for commercial purposes. He found that reception outside the Territory was not sufficiently dependable for commercial purposes.

The trial judge had also propounded, for decision by the court, himself, the question: "What does this broadcast company make its money out of?" He concluded that, except for short-wave relays, complainants made their money from their broadcasting to the Hawaiian audience and that, upon the facts, KPOA was distinguishable from a station on the mainland so situated as to have reception sufficiently constant in another State or Territory to be of commercial value.

Noting that the tax is one of general application to all business in the Territory, the trial judge held that, in view of the source of the receipts of KPOA taxed, the Territory was not precluded from taxing same; and, further, that complainants had not shown that the tax was such a burden as to interfere with their operations—relating to or affecting or being in the course of business of and broadcasting by their station KPOA—and concluded that the tax was valid.

Findings and conclusions proposed by the tax commissioner, which had been served and filed on January

11, 1952, were, at the conclusion of the trial, to wit, in pronouncements from the bench on January 15, 1952, approved by the trial court, and the submission of a written decision by the prevailing party was directed. Following a hearing upon the form of decision, a written decision was entered and filed on January 28, 1952. It incorporated by reference the prior pronouncements by the trial judge, or so-called "oral decision," and set forth the findings and conclusions that had been requested and approved, together with other findings and conclusions announced from the bench.

On January 31, 1952, the judgment was presented, signed and filed.

Section 10107, Revised Laws of Hawaii 1945, with respect to such a trial as was had, without jury, requires that:

"In such case the court shall hear and decide the cause, both as to the facts and the law, and its decision shall be rendered in writing stating its reason therefor." * * *

Because of such statutory provision, the prior oral pronouncements by the judge were merely informative to the parties of the conclusions he had reached, which was the prevailing party, and what should, *inter alia,* be incorporated in the decision of the court, and the written decision, signed by the trial judge and filed on January 28, 1952, must be, and only that is, by this supreme court of Hawaii, deemed to be the decision of the trial court.

Upon the evidence, the trial court found and concluded:

"* * * with the exception of the short-wave relays, KPOA makes its money with the Hawaiian audience in view and not the audience outside the Territory." (R. 71:

Tr. 750.)

"* * * the complainants have not shown to this court that this 2½% gross income tax, which everybody in the Territory pays, not only the radio stations but everybody else, is such a burden upon this station as to interfere with its operation." (R. 72; Tr. 753.)

Further, as set forth in said decision, the trial court made the specific findings as follows:

"1. In so far as places outside the Territory of Hawaii are concerned, KPOA's broadcasts on its standard band do not afford effective or satisfactory service that measures up to the standards for commercial coverage.

"2. Time buyers do not buy time on KPOA as a medium of communication to an out-of-the Territory audience.

"3. Where a KPOA broadcast is directed to an out-of-the Territory audience a short-wave relay is used, as in the case of the program 'Hawaii Calls.'

"4. The tax has not been assessed on any receipts from broadcasts carried out of the Territory by short-wave relay or brought into the Territory by short-wave relay.

"5. During daylight hours enjoyable listening to KPOA's standard band broadcasts is impossible at places outside the Territory, and is limited to ships or planes that happen to be within range.

"6. During hours of darkness reception of KPOA's standard band broadcasts outside the Territory is too unreliable and irregular for such reception to have commercial value.

"7. KPOA has a 'foreign language department' which is offered by it as a service to advertisers. This department conducts, each broadcast day, a substantial number of hours of broadcasts in Japanese and in a Filipino

dialect. These broadcasts are scheduled by the station each day on a participating basis, that is, the station puts on the foreign language programs and sponsors buy spot announcements on the programs.

"8. A large number of KPOA time buyers have no desire or occasion to reach any audience outside the Territory, even if effective and satisfactory service were offered.

"9. The radio audience outside the Territory of Hawaii is not a factor in the selling or buying of radio time on Station KPOA, where no short-wave relay is employed." (R. 76, 77.)

The complainants brought the case here on writ of error and, as plaintiffs in error, have submitted assignments of error numbered 1 to 33, inclusive, and specifications of error numbered 1 to 33, inclusive, but number 33 of the assignments is not included in the specifications and 2 to 33 of the latter are the same assignments 1 to 32.

The opening brief on behalf of complainants allegedly contains "Argument on all Specifications of Error," but such argument is general, not keyed to the specifications of error, and does not actually cover all of same. Wherefore, such assignments and specifications of error as have not been clearly included in the argument, either by express reference thereto or by incorporation of the substance thereof, are deemed waived or abandoned. (*Hite* v. *Queen's Hospital*, 36 Haw. 250, 313; *Moore* v. *Tremelling*, 100 F. [2d] 39, 43 [9 C. C. A.].)

Accordingly, specifications of error number 2, which is the same as assignment of error number 1; specification of error number 9, assignment of error number 8; and assignment of error number 33, the latter not even included in the specifications of error, are deemed to have, severally, been abandoned or waived. (See also *Aiau* v.

*Aiau,* 39 Haw. 122, *Watumull* v. *Tax Commissioner,* 34 Haw. 84; *U. S.* v. *Los Angeles Soap Co.,* 83 F. [2d] 875, 889 [9 C. C. A.]; *Humphreys Gold Corporation* v. *Lewis,* 90 F. [2d] 896, 897 [9 C. C. A.].)

After considering each and all of the specifications and assignments of error other than those deemed abandoned or waived as aforesaid, and giving heed to oral arguments presented and briefs submitted to this court, together with the record and transcript in the case, we have concluded that the compainants, as plaintiffs in error, have failed to sustain the burden, which has been upon them, of showing reversible error in the proceedings below and on the part of the trial court; wherefore, the decision and judgment of the trial court are, and each respectively is, affirmed.

Upon what and why we have affirmed the decision and judgment of the. trial court, as thus, *supra,* early herein announced, will be apparent from a reading of what is hereinafter set forth.

In seeking review and reversal of the findings, decision, and judgment of the trial court, the complainants have contended that:

"Congress preempted the 'financial' aspects of a radio station's existence by affirmatively writing the word 'financial' in the statute. The Federal control on the subject was so complete that even had Congress not used the word 'financial,' the mere silence of Congress on the subject would have amounted to a prohibition of a state to have considered the 'economic' aspects of a station at all. However, Congress affirmatively used the word 'financial' and the Federal Communications Commission concerns itself with the 'economic' aspects of a station, under the Act of Congress. The Commission will only let a station earn

70% of its potential. All other businesses can earn 100%. But not radio. It must *give* 30% of its time to the public interests without charge. Therefore radio has only 70% of its earning potential left. Now, the Territory seeks to whittle that down. However, Congress is ahead of the Territory and preempted the 'financial' aspects of radio. State taxes affect the 'economic' and 'financial' aspects of a station; therefore a state must give way to a superior Federal control on the subject matter." * * * (Br., pltfs in error, pp. 14, 15.)

"A reading of the testimony of Plaintiffs' witnesses shows that the complaint was fully established. A reading of the testimony of the Territory's witnesses shows that *only the strength* of KPOA's *signal was assailed, and nothing else.* And, this was of no legal and consequential moment for the Supreme Court has ruled, '*All* Broadcasting (*Fisher's Blend* Case) is interstate commerce.' The Communications Act states (Sec. 301, Title 47 USCA, Subsection A) that a broadcast

'From one place *in any territory* or possession of the United States or in the District of Columbia to another place in the same territory, etc.'

is covered by the Communications Act. Even a taxicab broadcast in Honolulu is pre-empted by the Congress from the power of the Territorial Legislature.

"So is a broadcast

'from any place in any state, territory, etc. . . . to any vessel.' (See 'C' of Sec. 301, Supra.)

"Therefore, what difference does it make as to the strength of KPOA's signal as long as it is a broadcast signal? What difference does it make whether a broadcast is received from a 'sky wave' or 'ground wave'? The reception is the thing, and that cannot occur without the broad-

cast of an electrical impulse—the signal. And, no signal can be broadcast anywhere, no matter its power, 4 watts or 1000 watts, without creating a zone of interference some place with another unknown transmitter or receiving set. That is why all channels in use, and the names and call letters of those who use them, and the nations to whom they are assigned, must register in Switzerland, as the complainants in error in this case are registered." (Br., pltfs in error, pp. 63, 64.)

CONTRA, the tax commissioner submits that:

"I. The court's findings are supported by the evidence.

"II. The court correctly applied the principle that intrastate communication, from a radio station in the Territory to the audience in the Territory, may be taxed.

"A. The business of effecting communications between points within the state is subject to state taxation upon the proceeds thereof.

"B. The scope of the regulatory authority of the Federal Communications Commission is not the yardstick for this case.

"C. Intrastate business need not be conducted separately from interstate commerce; cases of flat license fees must be distinguished.

"D. Interstate commerce that is only incidental is to be disregarded.

"E. The Hawaii tax is a tax upon intrastate communication measured by the gross receipts of that business.

"F. Federal and state decisions as to state taxation of radio broadcasting uphold the Tax Commissioner's position here.

"G. The 'multiple burden' test has no significance where, as here, only intrastate communication is taxed.

"III. The taxing power of the Territory of Hawaii is

as great as that of a State.

"IV. Congress has not preempted the field to the exclusion of state taxing power.

"V. The written decision, incorporating the oral decision, was duly entered and is the decision of the Court below.

"VI. The Tax Commissioner's counterclaim was allowable under the governing laws.

"VII. The Tax Commissioner properly was allowed penalties and interest as part of the judgment on the counterclaim." (Br., deft in error, pp. 9, 10.)

The brief on behalf of the tax commissioner contained a summary of evidence presented and received in the trial court; such summary has not been contradicted in the reply brief on behalf of the complainants and has been found by us to be correct; however, we believe that the hereinafter contained condensation and quoted portions thereof will be sufficiently informative to a reader hereof.

On July 11, 1946, the complainants' partnership obtained a license under section 5451 of chapter 101 of the Revised Laws of Hawaii 1945, known as the "general excise tax," or "gross income" tax law, and on October 15, 1946, their station KPOA commenced broadcasting.

The partnership returned, for taxation, its broadcasting income for the period October 1, 1946, to and including December 31, 1946, and for the first 11 months of 1947, and paid the tax assessed thereon without claiming any exemption or deduction for interstate commerce, but for December, 1947, and thereafter, while continuing to report income from broadcasting, claimed exemption of all such income on the ground of it being from "interstate commerce."

Subsequent to the period involved in this case—to wit,

the period from 1947 to July 31, 1950—complainants constructed and commenced the operation of Radio Station KILA in Hilo, on the island of Hawaii. KILA commenced broadcasting on March 28, 1951. KPOA and KILA together constituted what is called the "Inter-Island Network," offering broadcasting time over the two stations at a combined rate, or over either at a rate for each, respectively.

"* * * From the profits complainants have invested $110,750.00 in Station KYA in San Francisco (Ex. 48, Balance Sheet of Sept. 30, 1951), each having purchased, on April 12, 1950, one-half of the stock of the corporation which operates this station (Ex. 17). They also have invested, from their profits, $13,221.00 in Station KILA, the Hilo station, and about $11,000 in an F. M. station, KWJJ (Ex. 48, Balance Sheet of Sept. 30, 1951, and Abstracts of Capital Accounts). In addition to the acquisition of these properties from the stations' earnings the partners have enjoyed substantial drawing accounts (Ex. 48, Abstracts of Capital Accounts). The partnership showed, as of September 30, 1951, a net worth of $223,690.77 inclusive of the investments in other radio stations, or $88,589.35 exclusive of such investments in other stations (Ex. 48, Balance Sheet of Sept. 30, 1951). On the $88,000.00 investment in KPOA itself, 1951 profits were at the rate of $7,100 per month (see Ex. 48, Profit and Loss Statement for the first nine months of 1951), or over $85,000.00 per year, an annual return of more than 96% on the investment in KPOA. These profits were over and above the tax here contested, which was set up in a reserve account (Ex. 48, Abstracts from General Ledger relating to territorial tax and reserve for territorial tax, and profit and loss statements).

"* * *

"*KPOA's Federal Communications Commission application and license.* KPOA holds a license from the Federal Communications Commission (Ex. 6) under which it went on the air on October 15, 1946 (Ex. 41). The license since has been renewed (Ex. E). Numerous papers and exhibits filed with the application are in evidence (Exs. 5, 5-A, 6, 7, and 8). There also are in evidence as Exhibit 1, the Federal Communications Commission 'Rules Governing Standard Broadcast Stations,' which is Title 47 of the Code of Federal Regulations, Chapter 1, Part 3, Subpart A, and the appendix to said Rules, also issued by the Federal Communications Commission, known as 'Standards of Good Engineering Practice Concerning Standard Broadcast Stations,' Exhibit 2. * * *

"As shown by Exhibits 1 and 2 and also by oral evidence (Tr. 101, 108, 498) KPOA is a Class III-A station on a regional channel, with an assigned frequency of 630 kilocycles and operating power of 5,000 watts, or 5 kilowatts.

"KPOA operates on the standard broadcast band. The 'Standard Broadcast Band' means the band of frequencies extending from 550 to 1,600 kilocycles inclusive. (Ex. 1, p. 3, Sec. 3.2). There are three classes of standard broadcast channels, known as 'Clear Channel', 'Regional Channel', and 'Local Channel' (Ex. 1, p. 3, Sec. 3.21). On a clear channel there are dominant stations known as Class II (Ex. 1, p. 3, Sec. 3.22(a)). For purposes of contrast it is important to note what the Rules state about the dominant or Class I stations on clear channels, that is, that they 'render service over wide areas', 'over an extended area and at relatively long distances' (Ex. 1, p. 3, Sec. 3.21; Ex. 2, p. 1). Here involved is a Class III sta-

tion on a regional channel, and as to such stations the Rules and Standards state that they are 'designed to render service primarily to a metropolitan district and the rural area contiguous thereto' (Ex. 1, p. 4, Sec. 3.22 (c) ; Ex. 2, p. 2).

"In its application papers KPOA stated that its proposed operation would 'provide an additional high standard of service to this community' (Ex. 5, p. 96). The application reviewed the increase in the population of the Territory of Hawaii and particularly the city and county of Honolulu, and the economic growth of the Territory, and stated:

'It is particularly desirable to offer the Territory of Hawaii the type of service herein outlined, with relatively high-power on a low frequency in order that the entire group of Islands will receive benefit of the service.

'Experience has shown that a market as large as Honolulu and the Territory of Hawaii requires and will support the additional broadcasting service proposed in this application. The highly isolated position of the Territory of Hawaii makes it even more essential that adequate local facilities be provided in order that the public will be offered the amount and variety of service to which it is entitled.' (Ex. 5, p. 120.)

"Included in the application was a map (Ex. 5, p. 100) a copy of which was, for convenience, separately introduced as Exhibit 5-A. * * *. This map shows what are known as the protected contours of the station; * * *.

*"Propagation of radio signals in general; groundwaves and skywaves.* Standard broadcast stations in the United States use a vertical radiator, or tower. Transmission of radio signals is effected by groundwaves and skywaves, the effect of the use of the vertical radiator being to con-

centrate the station's signal in the groundwave to the greatest possible extent. The Federal Communications Commission requires the station to concentrate its energy as much as possible in the groundwave. (Tr. 44)

"The groundwave is that which flows along the earth's surface, while the skywave is radiated up into the sky at an angle and reflected back from the ionosphere, commonly called the heaviside layer (Tr. 23-25). * * * Under certain phenomena the skywave can be heard almost any place on earth. (Tr. 746, 747) * * *

"*Daytime reception; transmission by the groundwave.* During daylight hours the skywave is absorbed by the ionization action of the sun's rays, and during daylight hours broadcast reception of a useable signal by means of the skywave is not possible. This means that during daylight hours standard band broadcasts can be transmitted only by the groundwave. The groundwave is attenuated by the earth's surface. The reach of the groundwave is the same, day or night. How far it will transmit depends upon such factors as the frequency on which a station operates, the power of the station, ground conductivity, and obstructions in the path of the signal, including both natural obstructions such as mountains and hills, and man made obstructions such as steel structures, bridges, power lines and in fact any type of buildings in a normally populated area. (Tr. 366-368)

"*Field intensity, how measured.* The strength of the signal at point of reception, or field intensity, is measured in 'microvolts per meter', expressed by the symbol uv/m, or 'millivolts per meter', expressed by the symbol mv/m. One thousand microvolts per meter, or 1,000 uv/m, equals one millivolt per meter, or 1 mv/m. A fraction of one mv/m, for example a half, or 500 uv/m, often is expressed

by the use of the decimal, which in the sample above given would be .5 mv/m. Similarly .04 mv/m constitutes 40 uv/m, or forty microvolts per meter, and .006 mv/m constitutes 6 uv/m, or six microvolts per meter. (Tr. 55, 507, 523-527)

"*Factors affecting reception.* Many factors affect the reception of the signal. One such factor is the sensitivity of the receiver; this factor has to do with the basic minimum of required strength of signal for listenability, above and beyond which other factors will require a stronger signal. The sensitivity of the receiver is the measurement of its ability to accept signals above or below a certain intensity, and the sensitivity of the receiver is measured in microvolts per meter, just as field intensities are measured. In view of the very decided trend toward radio receiver sets with built-in antennae, particularly table models (Ex. 46), it is noteworthy that while some table models are so well made as to have a sensitivity of 40 to 50 uv/m, others require over 150 uv/m to receive a signal. (Tr. 380, 381)

"Above and beyond the basic minimum of field strength necessitated upon consideration of the sensitivity of the receiver, there is the factor of the noise level to be considered. There are two types of 'noise', that is, atmospheric noise and man-made noise. Atmospheric noise arises, for example, from lightning and rain storms. Man-made noise arises both from domestic and industrial activities. The noise level from industrial activity is exemplified by that arising from the activity at a miltary installaton compacted in a small area. In the home, electric razors, electric sewing machines, and electric mixers create noise of 200 uv/m and even more. If such electrical implements are employed in an area of overhead power lines the noise

produced can radiate at a great distance. By reason of the effect of the noise level on reception of radio signals, the field strength required for satisfactory listening usually is set upon consideration of the type of locality at point of reception. (Ex. 2, p. 304)

"Interference from other radio stations is a major factor to be considered. By Federal Communications Commission standards, the ratio by which to judge interference is 20 to 1, that is, if at point of reception the dominant signal is 20 times stronger than the interfering signal it is assumed that the interference is not objectionable. (Tr. 65, 66, 404) * * *

"*Licensed area; protected area; field intensity required for reception by the groundwave.* The Federal Communications Commission Rules and Standards (Exs. 1 and 2) set forth what is the licensed area of a radio station, what is its protected area, and what are the signals necessary for different types of service, i.e. by the groundwave and by the skywave.

"The licensed area is the particular city, town or other political subdivision where the station is located and as to which it must meet certain requirements as to main studios (Ex. 1, p. 5, Sec. 3.30).

"The protected area is that which, in the assignment of frequencies by the Federal Communications Commission, is protected from interference. A Class III station is entitled to protection only for its groundwave (Ex. 2, p. 2, Col. 1). By reason of the fact that nighttime skywave action increases the problems of interference, the protection given by night is not as great as that given by day. At night a Class III-A station is protected only as far out as its groundwave measures 2500 microvolts per meter, called the 2500 uv/m groundwave contour, while

by day it is protected to a further distance, that is, as far out as its groundwave will measure 500 microvolts per meter, called the 500 uv/m groundwave contour. Exhibit 5-A shows the protected contours of Station KPOA as shown by the map in its Federal Communications Commission application (Ex. 2, p. 2, Col. 1, Par. (a) ; Ex. 5-A).

"Actual field strength measurements of KPOA's groundwave signal were made on the islands of Hawaii, Maui, Kauai and Oahu, and a map prepared by Fred L. Mason, the radio engineer called by the Territory (Ex. 37). These were actual measurements as affected by land masses, mountains and other obstructions, as distinguished from theoretical computations of what might be achievable under the most favorable of conductivity conditions. Exhibit 37 shows, by blue shading, the areas on the islands of Hawaii, Maui, Kauai and Oahu where KPOA's groundwave signal measured below 500 uv/m. The distance from Honolulu to the point where the signal dropped below 500 uv/m, i.e. from Honolulu to the 500 uv/m groundwave contour, was at its greatest 186 miles. In the areas where the KPOA signal dropped below 500 uv/m there were many times when it was considerably below that, even lower than 100 uv/m, for example, in the vicinity of Hilo and at Wailuku. (Tr. 408, 410, 49)

"* * *

"The Federal Communications Commission, in its Rules and Standards (Exs. 1 and 2), has set up reasonable standards for satisfactory signals under average conditions. These Rules and Standards define the service areas of a radio station (Ex. 1, p. 3, Sec. 3.11) and the signals necessary for the different types of service (Ex. 2, pp. 3-4). By Federal Communications Commission terminology service by the groundwave is described as

'primary' or 'intermittent' (Ex. 1, p. 3, Sec. 3.11; Ex. 2, pp. 3-4). To render primary service in any town, even one with a population under 2500, the minimum ground-wave signal intensity must be 500 uv/m or .5 mv/m (Ex. 2, p. 4, Table II). To render primary service in a rural area, not a center of population, a 500 uv/m groundwave signal may be required, but it is recognized that in some rural areas as little as 100 uv/m or .1 mv/m groundwave may serve (Ex. 2, p. 3, Table I).

" 'Intermittent Service' is the term applied in the Federal Communications Commission Rules and Standards to the area beyond the primary service area, above considered, where service by the groundwave may be achieved under certain conditions (Ex. 1, p. 3, Sec. 3.11; Ex. 2, p. 4, beginning in Col. 1). As the name implies and as the Federal Communications Commission Standards explain, this is an inferior and unreliable type of service, * * *. * * * in Hilo and vicinity, reached by the groundwave of KPOA but having less than 100 uv/m of field strength, complainants did not render satisfactory service before they constructed Station KILA for operation with KPOA as the Inter-Island Network. This was brought out in connection with a Federal Comunications Commission rule (Ex. 1, p. 10, Sec. 3.106) that a license cannot be granted to a network organization for two or more stations where one of them 'covers substantially' the service area of the other. Asked about this Mr. Keating, one of the complainants, admitted that KPOA did not cover Hilo 'substantially' before KILA was opened. There are other instances of common operations of stations in Honolulu and Hilo, that is, KHON at Honolulu with KIPA in Hilo, both on the Aloha Network, and KGMB in Honolulu with KHBC in Hilo, operated together as the Ha-

waiian Broadcasting System (Ex. 13, pp. 145, 146). * * *

"Computations based on the Federal Communications Commission graph 4, in appendix 1 of the Standards of Good Engineering Practice (Ex. 2), showed that on the most favorable assumptions as to ground conductivity (that is, assuming that conductivity of sea water had its full effect and without taking into consideration interfering obstructions), KPOA's groundwave signal would drop below 100 uv/m at a distance of 530 miles, at 640 miles would be 40 uv/m, and at 700 miles would be 26 uv/m. From there on, further calculations can be made according to the method explained by the Federal Communications Commission's regional manager. Distances from Honolulu to various points appear in statute miles in the table in the corner of Exhibit 38.

"Since reception during daylight hours depends on the groundwave, these computations place out of the bounds of possibility enjoyable listening of KPOA during daylight hours, except in the Territory or on some ship or plane happening to be within range. Mr. Mason, the radio engineer called by the Territory, so testified, and the court so found (R. 76). * * * Even on the Pacific Islands the noise level would be over 40 to 50 uv/m due to the military installations and high degree of industrial activity in a small area. (Tr. 390-392)

"There was testimony that KPOA had been heard on the Battleship Iowa at a distance of 1500 miles out, before sunset; Mr. Mason explained that at that distance KPOA might possibly have a groundwave signal of 1 or 2 microvolts which might be picked up on a battleship on the very expensive and elaborately designed receiver carried by it, having a sensitivity well below 2 uv/m. Such reception would be possible only with this type of Navy

receiving equipment. (Tr. 429-431) * * *

*"Nighttime reception; reception by the skywave.* To obtain more distant reception than can be achieved by the groundwave a radio station must be able to effect this by the skywave, and this is possible only at night.

"As compared with the groundwave signal, which is stable, the skywave signal is subject to fading. Fading is of several types. One type is intensity fading, which means that the intensity is changing constantly and the measurement can only express the median or average. (Tr. 377-379, 530-531)

"While radio receivers are equipped with a device known as automatic volume control, which will take care of intensity fading if the signal does not fade below the required field intensity (i.e. the intensity required upon consideration of such factors as sensitivity of the receiver and the noise level), of course automatic volume control, or AVC, cannot compensate for fading below the required minimum of field strength. (Tr. 378, 379)

"The skywave does not offer effective reception immediately after sunset, there usually being a transition period of approximately two hours during which there is considerable distortion and instability of the signal. The best time for skywave transmission is after midnight. (Tr. 377)

"In estimating the possibilities of service by the skywave one must take into consideration not only the hours of darkness at the point of transmission but also those at the point of reception. Of course the time when there is darkness over the entire transmission path will differ according to whether the supposed point of reception is north or northeast, or west or southwest, and according to the season of the year at the supposed point of recep-

tion. (Tr. 493-495)

"Conditions for skywave propagation are better in winter than in summer. Also, static disturbances are greater during the hot months than during the winter months and static interference is a bigger factor at night when skywave reception is a possibility than it is by day. However, the supposed point of reception of some latitudes will be in the opposite season from that in Hawaii. (Tr. 450, 484)

"Propagation conditions that affect the skywave vary not only during a single night and season to season but also with changes in sun spots. (Tr. 375, 376)

"If one were to assume that at a given time, and in a given location KPOA's skywave could be received with sufficient signal intensity to keep above, and not fade below, the sensitivity of the receiver and the noise level, and to allow for the obstructions (mountains, or structural obstructions) which always impede the signal— * * * — one still would have to consider the factor of interference. During hours of darkness when KPOA's signal may be carried to considerable distances under favorable conditions this is true also of every other station. As above noted a signal 20 times the strength of an interfering signal is required to overcome the interference. There are many stations on KPOA's frequency of 630 kilocycles (Exs. 33, 34, and 35). As to such stations, their operating schedules and time zones have to be considered in connection with problems of interference. While such stations may sign off at midnight they are not required to do so if licensed for an unlimited time; they may extend their operating schedules at any time. (See Ex. 33, Stations marked "U".) Further illustrating the complexities is Station 4QN in Australia, 630 kilocycles, 7

kilowatts (Exs. 35 and 36). This is a station operating in a time zone that is 20 hours ahead of Hawaii, that is, it is operating on the next day's date at a time 4 hours earlier by the clock, so that when it is 7 p.m. in Australia it is 11 p.m. in Hawaii. When darkness occurs in Australia, Station 4QN will start putting in interference, and this will be a fact to be reckoned with in the Pacific area.

"In addition to the problem of interference from stations on the same frequency there is the problem of adjacent channel interference. In relation to 630 Kc, adjacent channels are 640 Kc and 620 Kc. A radio receiver will not be able to reject a very strong signal on an adjacent channel. Stations on 640 Kc and 620 Kc are listed in the exhibits (Exs. 33 and 34).

"The Federal Communications Commissions Rules and Standards (Exs. 1 and 2) refer to service by the skywave as 'secondary service' (Ex. 1, p. 3, Sec. 3.11; Ex. 2, p. 4, Col. 1). The Standards state that 'secondary service is delivered in the areas where the skywave for 50 percent or more of the time has a field intensity of 500 uv/m or greater' (Ex. 2, p. 4, Col. 1). This is a reference to the line designated '50 percent' in the chart appended to the Federal Communications Commission Standards and marked 'Figure 1' (Ex. 2). In this connection it must be taken into consideration that the 50% skywave measurement is only an average or mean, expressing field intensity expected to be obtained or exceeded half the time, so that the other half of the time the signal may fade in intensity considerably below this (compare the 95% curve in Figure 1 in the appendix to Exhibit 2). The 50% skywave of a Class III-A station of 5 kilowatts would be computed at only 228 uv/m at 300 miles distance from the station, decreasing in intensity as one proceeded out to greater dis-

tances (Tr. 531, 532). It will be noted that the Federal Communications Commission Standards state that: 'Class I stations only are assigned on the basis of rendering secondary service' (Ex. 2, p. 4, Col. 1), and that as above noted this is a Class III-A station.

"* * * .

*"Trade practices.* * * *

"Among the exhibits illustrating trade practices is a 'Spot Radio Promotion Handbook' (Ex. 14), listing the factors which influence time buying (Ex. 14, pp. 31, 32). The gist of it is that each station serves a specific area of its own, and buyers of radio time want to know where the station can be heard clearly (Ex. 14, p. 32).

"Witnesses in the trade, including both owners of radio stations selling radio time on the one hand, and advertising agents engaged in the purchase of radio time on the other hand, testified that a sponsor directs his message to a 'market area' where he distributes his products, that he is interested in buying radio time only if the area reached by the station is one in which he has distribution, that the station must have a substantial penetration of the potential radio audience in the market area, and that costs in relation to number of people reached is basic, as well as the quality of programs. The sponsor studies not only the station's coverage of his market but also the composition of the radio audience, its wealth, listening habits and the like (Ex. 43).

"Cost usually is figured at 'cost per thousand' (Tr. 549). In measuring the audience reached the usual unit of measurement is a 'radio home', which means a dwelling with one or more radio receivers in use. 96% of homes in the Territory are radio homes (Ex. 23. p. 108). Since the

Territory has 109,600 households according to the last census (Ex. 24), this means over 100,000 radio homes in the Hawaiian market (Ex. 23, p. 104) or applying the ratio of 96% to 109,600 households, roughly 105,000 radio homes.

"To show its coverage of the market a station often uses a coverage map. The record contains examples of station coverage maps, both on the mainland and in Hawaii (see below). These exhibits include advertisements in well-known trade magazines such as 'Sponsor' and 'Broadcasting-Telecasting', station audience maps issued by John Blair & Company, a well-known national organization engaged in representing radio stations, and coverage maps or brochures issued by Hawaiian stations, including one issued by KPOA itself.

"These coverage maps, both on the mainland and Hawaii, in many instances show the 500 uv/m contour of the station. Reference is made to the advertisement of Station KGW, Portland, Oregon, Ex. 44-a, p. 8 of Sponsor Magazine of March 12, 1951, showing the 500 uv/m contour and stating that it is taken from the map on file with the Federal Communications Commission; to the advertisement of WTAG, Worchester, Massachusetts, appearing on the back cover of Sponsor Magazine of March 12, 1951, Ex. 44-b; to the advertisement of five Florida stations published by John Blair & Company in Sponsor Magazine for April 23, 1951, pp. 17-20, Ex. 28, where Station WFLA, the third station advertised, is advertised by its half millivolt coverage; to Ex. 3, a map on a KULA program schedule for November 1947, and Ex. 4 showing the source of Ex. 3; and to Ex. 42, the Aloha Network map. Field strength measurements are the basis of KPOA's own brochure, Ex. 9, which contained a great deal of data

analyzing the field strength of all the different Hawaiian stations at various points in the Hawaiian Islands, * * *. Field strength measurements continue to play a part in KULA advertising, the record containing in addition to the 1947 program schedule (Ex. 3) a 1951 program schedule (Ex. S) having on the cover a map marked with millivolts of claimed field strength at various points.

"To show the number of radio homes reached estimates may be made based on number of radio homes within the area having adequate millivolt coverage, or surveys may be made. A much cited survey organization is the Broadcast Measurement Bureau, referred to as BMB (See Exs. 26, 27, 28, 44-a, 44-b, and 45). The BMB survey was made by mail, to ascertain each county in which a station was heard; if less that 10% of the radio homes in a given county reported once-a-week listening that county was not listed for the station (Exs. 26, 27). BMB made two surveys, one in 1946 and one in 1949 (See above cited Exs. 26 and 27 based on the 1946 survey, and Exs. 44-a, 44-b, and 45 based on the 1949 survey). These surveys were sponsored by the industry itself; the bureau now is reorganizing under independent sponsorship. Its work illustrates the importance of establishing penetration of areas in order to bring them within the station's coverage.

"* * *

"* * *, none of the exhibits relating to the Hawaiian stations claims coverage beyond the Territory (Tr. 749; R. 75). * * * in none of the exhibits is there a claim of coverage outside the Territory. See exhibits 3, 9, 42, and 43, and S. * * * .

"*Distant reception.* The term 'distant reception' is used * * * in reference to reception at places not served by the groundwave, where reception can only be by skywave,

at night, but does not meet the Federal Communications Commission standards for service by the skywave. * * * .

"By selecting favorable hours at night one can tune in on distant stations if propagation and atmospheric conditions are good and there happens to be no interference. What might well be termed 'fishing' for distant stations is a sport among persons known as 'DX'ers'. This is a loosely organized group of persons interested in this particular pursuit; they often use a form to report their reception, with the hour of reception and their own rating of the signal as to strength and clarity; (as to the symbols used by DX'ers see Ex. 57, pp. 24 and 25). Complainants produced, as Exhibit R, samples of mail from DX'ers, including also some letters from listeners who wrote in without the use of a form. Exhibit T consisted in letters of the same type received by Station KULA. Every station receives mail of this type, as was testified by Mr. Howard, owner and operator of KIKI, a witness for complainants and by the two radio station owners and operators called by the Territory, Mr. Fitkin of KHON and Aloha Broadcasting Company and Mr. Mulrony, co-licensee of Station KGU.

"These distant listeners and this type of mail have no commercial value, * * *. * * *.

"Mr. Fitkin, whose Station KHON broadcasts twenty-four hours a day on 1380 kilocycles, a frequency that is favorable for skywave reception testified that he received mail of the same type as Exhibits R and T, some of the letters stating that the station was coming in clearly. Mr. Fitkin stated that such letters from places outside the Territory have no sales value, and that out-of-the-Territory reception of standard band broadcasts of Hawaiian stations has no value to a sponsor. (Tr. 560-563) .

"Mr. Mulrony, vice-president of the Advertiser Publishing Company and co-licensee with the Advertiser Publishing Company of Station KGU, the NBC affiliate in the Territory, who had been operating KGU for thirty years, testified on the basis of his thirty years experience in Hawaii in the radio broadcasting business that 'we have never had a dollar beyond the Territory of Hawaii for coverage beyond the Territory' and that no radio audience outside Hawaii had been a factor in the selling and buying of radio time by KGU; that the possibilities of reception outside the Hawaiian Islands had played no part in the competition for business; that he received listener mail of the types of Exhibits R and T, some of the mail saying that the station was coming in clearly, and that such mail had no sales value. (Tr. 581-585)

"Dudley Carroll, Jr., manager of the Honolulu branch office of N. W. Ayer & Co., a national advertising agency with offices in Boston, New York, Philadelphia, Chicago, Detroit, San Francisco and Hollywood, as well as Honolulu (Tr. 593, 594), testified that in his experience no radio audience outside Hawaii was a factor in the buying of radio time on Hawaiian stations, that no presentation ever had been made to him by any Hawaiian station that his clients could reach outside of Hawaii on Hawaiian stations. (Tr. 598)

"Jim Wahl, director of radio at the advertising agency of Holst, Cummings and Myers, with thirteen years' work in radio in Hawaii preceding his advertising agency work, testified that it was not the practice for an advertising agent to accept, as part of a Hawaian station's coverage, listener mail of the type of Exhibits R and T coming from points outside the Territory and such mail 'is not considered in the time we purchase.'; that the radio audience

outside Hawaii is not considered a factor in the buying of radio time on Hawaiian stations. (Tr. 610, 611, 616)

*"Programs: short-wave relays.* KPOA's program content is illustrated by program logs for a sample week, Exhibits 21-a to g inclusive, produced by the Territory. (The method of sampling is explained at Tr. 205.)

"Network programs are carried by the station, which is affiliated with Mutual Broadcasting System. However KPOA was not affiliated with Mutual Broadcasting System until toward the end of the period involved in the present case. On the mainland, when a network program is broadcast simultaneously in a number of cities the program is carried from station to station by telephone relay; whereas between the continental United States and Hawaii this is accomplished by short wave instead of telephone, enabling the Hawaiian broadcast to be simultaneous with the mainland broadcast. This type of simultaneous broadcast in Hawaii of a mainland program is referred to * * * as a 'short-wave relay'; the term also is applied to Hawaiian programs carried by short wave to the mainland, of which the program 'Hawaii Calls' is the prime example. These instances of simultaneous broadcasts accomplished by means of short-wave relay have not been included in the measure of the tax (Ex. 50, pp. 1, 3, 7; Exs. 58-a to d). However, they constitute only a very small percentage; the usual practice is to record a network program and bring over the transcription for use by the Hawaiian station (Ex. I). As a result there is a lag in presentation, network programs appearing in Hawaii a week, and sometimes two to three months, after appearance of the same programs on the mainland. (Tr. 200, 201; Ex. 19)

"KPOA of course also sells program time having

nothing to do with its network affiliation, as illustrated by the program logs. 'Participating programs' are programs for which there is more than one sponsor. The term 'participating program' also is applied to a program scheduled by the station with the station selling spot announcements on the program (Tr. 203). A spot announcement is a separate announcement that is put on at a specific time (Tr. 200).

"KPOA has a foreign language department which is advertised by it (Ex. 13, p. 147). This department offers programs in Japanese and in the Filipino dialect, respectively, which are scheduled by the station itself each broadcast day, the station deriving its revenue from sales of spot announcements on these foreign language programs. Examples are the 'Cherry Blossom Melody' program, a Japanese language program appearing throughout the program logs at various times of the broadcast day, the 'Pineapple Filipino Hour', and 'The Filipino Program' (Tr. 210-216). * * *.

"Names of sponsors appear on the program logs (Ex. 21-a-g). Where the name of the sponsor is not self-explanatory of his business, Exhibit 49 furnishes information as to the sponsor and the nature of his business. From this material it appears that a great many sponsors, not only those on the foreign language programs but many others as well, are interested only in the Hawaiian market. * * *." (Br., deft in error, pp. 13-38)

There was ample evidence—as appears from the foregoing—to support the findings of fact made by the trial court and therefore such are conclusive, for this was a term case decided by the trial court under section 10107 of the Revised Laws of Hawaii 1945, and brought to this court by writ of error, so applicable thereto is the rule that

the trial court's findings are conclusive when supported by more than a scintilla of evidence; also applicable are the provisions of section 9564 of the said Revised Laws that there can be no reversal for any finding depending on the credibility of witnesses or the weight of evidence.

*Re Land Title Waimalu,* 33 Haw. 832, 833-835, and cases cited; *Territory* v. *Pai-a,* 34 Haw. 722-728; *Clarke* v. *Ward,* 34 Haw. 875, 877-878; *Feary* v. *Santos,* 38 Haw. 240; *Pong Ah Lim* v. *Ready-Mix Concrete Company,* 39 Haw. 326 (No. 2826, April 10, 1952).

Although the trial court's findings of facts are supported by evidence and thus are conclusive, because of the application of the rule and of the statute mentioned and cited, *supra,* we nevertheless express ourselves as being satisfied with the materiality of the evidence upon which the trial court based its findings and in accord with and so affirm the latter.

Having disposed of questions raised by complainants' assignments and specifications of error 3, 4, 5, 10, 20, 21, 22, 23, 24, 25, as to the evidence and the trial court's findings therefrom, to determine whether the complainants, as plaintiffs in error, had otherwise shown reversible error in the proceedings below and on the part of the trial court, we have also proceeded, in our usual manner, albeit as suggested, gratuitously, in the opening brief of complainants— * * * "thoughtfully, deliberately and fairly, to the end that the public interest will be served" * * * to and with a consideration of the several questions of law, inclusive *inter alia* of applicability of constitutional provisions, which have been raised by other of the complainants' assignments and specifications 6, 7, 8, 11, 12, 13, 14, 15, 16, 17, 18, 19, 26, 27, 28, 29, 30, 31, 32 of error.

Numerals herein refer to like numbered assignments

and specifications of error.

The questions, resulting from complainants' assignments and specifications of errors, were as to the trial court having allegedly erred in these respects:

holding complainants not entitled to recover the taxes paid under protest and holding the tax commissioner entitled to judgment on his counterclaim (4);

failing to hold that the tax involved is unconstitutional "because it creates a possibility of multiple burden" and levies a burden upon interstate commerce (6);

failing to declare and hold that the Hawaiian excise tax on radio broadcasting stations is illegal and unconstitutional (7);

in that "it usurped Congressional legislative functions when it based its decision upon declarations to the effect that 'complainants' revenue comes from Hawaii' and therefore should be taxed" (8);

failing to hold as a matter of law that all radio broadcasting is interstate commerce (11);

failing to hold that complainants' radio broadcasting station is necessarily engaged in interstate commerce immediately when a radio signal emanates from its transmitter * * * (12);

in failing to hold that it is impossible physically to separate a broadcasting signal into a sky-wave and a ground-wave so as to confine one to interstate commerce and the other to intrastate commerce (13);

in failing to hold that it is physically impossible for complainants' station KPOA, licensed by the Federal Communications Commission, to transmit only sky-waves and no ground-waves, or to transmit only ground-waves, or to transmit only ground-waves and no sky-waves (14);

in failing to hold that broadcasting by its very nature

is interstate commerce and that a tax on the privilege of engaging in any aspect of the broadcasting business is a tax on the privilege of engaging in interstate commerce and is therefore unconstitutional because prohibited by the Commerce Clause of the Federal Constitution (15) ;

in failing to hold that where as a physical fact the interstate and intrastate aspects of a business are so completely intermingled that the same physical acts result in the transmission of a signal both within and without the Territory of Hawaii, and where it is impossible to withdraw from the intrastate activities without also withdrawing from the interstate activities, the tax on the gross receipts of such a business is unconstitutional under the Commerce Clause of the Federal Constitution because it constitutes a tax on the privilege of engaging in interstate commerce (16) ;

in holding in effect that to be in interstate commerce the transmitted signal must of necessity be a signal to which an audience listens regularly and in failing to hold that the transmitted signal is not interstate commerce immediately upon its emanation from its transmitter (17) ;

in failing to hold that since the transmitted signal is capable of interfering with the signals of other broadcasting stations thousands of miles distant and is therefore subject to regulation by the Federal government alone, that there is no room for taxation by the States or Territories (18) ;

in failing to hold that radio broadcasting is peculiarly an interstate and international matter which must be and is regulated by the Federal government and internationally to prevent chaos in the broadcasting industry (19) ;

in ignoring the 'established rule of law' that where

Congress has preempted the subject matter of a field, as radio broadcasting in the case at bar, state and territorial legislatures cannot legislate upon any part of such matter whatsoever (26);

in failing to hold that the Federal government has preempted the field of radio broadcasting by the enactment of the Federal Radio Act and the present Communications Act of 1934, as amended (27);

in failing to hold in view of the preemption of the radio broadcasting field by the Federal government, the tax herein is an unconstitutional burden on the conduct of the complainants' broadcasting business and an unconstitutional tax on the privilege of engaging in the radio broadcasting business, "which is of itself interstate commerce" (28);

in holding that whether or not a radio station is an interstate enterprise depends upon its geographical location (29);

in holding in effect that a radio station in the center of a large State would be subject to state taxation but one near the boundary of another State would not (30);

in allegedly holding in effect that no uniform rule of law can be applied in the field of taxation of radio stations but that a separate determination must be made as to each radio station (31); and

"in that it held in effect that radio broadcasting can be part free and part taxed" (32).

Wherein they relate to evidence and the trial court's findings, or failure to make other findings, therefrom, we deem the question settled by what has hereinbefore been said anent there being ample evidence to support the findings made—which would, consequently, preclude the making of other findings contra or inconsistent with those

made—and as to the conclusiveness of same, so what is said hereinafter is pertinent to the salient features of constitutional and other law affecting the instant case and considered in connection with the complainants' assignments and specifications of errors.

In substance and effect, complainants' assignments and specifications of errors 6, 7, 8, 11 to 19, inclusive, and 26 to 32, inclusive, have presented only one issue for consideration and determination, to wit, whether, because of the "Commerce Clause" of the Constitution of the United States, Congressional enactment of the Communications Act of 1934, the powers thereby granted, or delegated, to, and the exercise of such powers by, the Federal Communications Commission, all radio broadcasting must be deemed interstate and subject not only to regulation and control, but also to taxation, by the Federal government, solely and to the exclusion of every State and Territory and to the extent that the gross receipts of KPOA from its broadcasts within the Territory of Hawaii which have no commercial value with respect to listeners to or receivers of same outside of the Territory, are exempt from taxation by the Territory, as radio broadcasting by KPOA is pursuant to and under license of the Federal Communications Commission.

We believe that the complainants have failed to sustain the burden which has been upon them of proving the affirmative of such issue.

In *National Broadcasting Company, Inc., et al.,* v. *United States et al.,* 63 S. Ct. Reporter, 997, 319 U. S. 190 (1943), the Supreme Court of the United States has so set forth the legal history of radio and shown the necessity and justification for enactment of the Communications Act of 1934 by the Congress of the United States, under the "Commerce Clause" of the Federal Constitution and the quantum

and scope of the powers by the Act granted or delegated to the Federal Communications Commission, that there cannot now be any question that the regulation of radio broadcasting is a federal function, with consequent preclusion of any right by a State or organized Territory to interfere therewith.

However, granting that the field of control and regulation of broadcasting has been preempted by the Congress, the assumption should not be made, as a corollary, that the Congress has likewise, or incidentally, preempted the field of taxation with respect to communications, inclusive of radio broadcasting.

In *Gibbons* v. *Ogden*, 9 Wheaton 1, pp. 197, 198, a case cited by the complainants, which was decided by the Supreme Court of the United States at the February term, 1824, Chief Justice John Marshall, in delivering the opinion of the court, said, *inter alia*:

"The grant of the power to lay and collect taxes is, like the power to regulate commerce, made in general terms, and has never been understood to interfere with the exercise of the same power by the States; and hence has been drawn an argument which has been applied to the question under consideration. But the two grants are not, it is conceived, similar in their terms or their nature. Although many of the powers formerly exercised by the states, are transferred to the government of the Union, yet the State governments remain, and constitute a most important part of our system. The power of taxation is indispensable to their existence, and is a power which, in its own nature, is capable of residing in, and being exercised by, different authorities, at the same time. * * * When, then, each government exercises the power of taxation, neither is exercising the power of the other. But, when a state proceeds to regulate commerce

with foreign nations, or amongst the several states, it is exercising the very power that is granted to congress, and is doing the very thing which congress is authorized to do. There is no analogy, then, between the power of taxation and the power of regulating commerce."

In *Federal Compress Co.* v. *McLean,* 291 U. S. 17, p. 23, decided January 8, 1934, the opinion of the court was delivered by Justice Stone and he said therein, *inter alia,* with respect to the appellant's claim of immunity from state taxation, because of operating under a license under the United States Warehousing Act:

"The fact that the license is used also as a means of governmental control of appellant's business does not call for a different conclusion. The national government has not assumed to tax the business or to exercise any control over the taxation of it by the state."

*Pacific Telephone and Telegraph Co.* v. *Tax Commission,* 297 U. S. 403; argued January 13, 1936, and decided March 2, 1936, was decisive of three appeals from judgments sustaining the validity of state taxes assessed against three foreign corporations, each engaged in both intrastate and interstate business, on the privilege of doing the intrastate business. In one case the telephone company sued to enjoin collection. The other two cases were actions by the State to collect the taxes from two railway companies. In the opinion of the court by Mr. Justice Brandeis, the latter said, *inter alia:*

" * * * a tax upon the local privilege only must be held valid in the absence of proof that it imposes an undue burden upon interstate commerce. 'The question of constitutional validity is not to be determined by artificial standards.' " * * *

" * * * Inherently the tax challenged is unobjectionable.

It is not upon an instrumentality of interstate commerce; it is moderate in amount; and is not a disguised attempt to discriminate against interstate commerce. * * * "

" * * * The company's business, both the intrastate and the interstate, was conducted at a profit during the tax period. * * * Not only is the intrastate business (even with the addition of this tax) no burden; it is that branch of the business which makes it financially possible to carry on the interstate. * * * "

In *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202, p. 212, argued February 1, 1944, decided May 8, 1944, Mr. Justice Frankfurter, in the opinion of the court, said:

"The Commerce Clause does not deprive Minnesota of the power to protect the special interest that has been brought into play by Union's localized pursuit of its share in the comprehensive process of foreign commerce. To deny the States the power to protect such special interests when Congress has not seen fit to exert its own legislative power would be to give an immunity to detached aspects of commerce unrelated to the objectives of the Commerce Clause. By its own force that Clause does not imply relief to those engaged in interstate or foreign commerce from the duty of paying an appropriate share for the maintenance of the various state governments. * * * "

In *Rapid Transit Corporation* v. *New York,* 303 U. S. 573, pp. 575, 576, argued February 7, 1938, decided March 28, 1938, the question for decision was the constitutional validity of local laws of the city of New York which provided that " 'for the privilege of exercising its franchise or franchises, or holding property, or doing business in the City of New York,' an excise tax should be paid by every 'utility' doing business in the city of New York during 1935 and the first six months of 1936." The view of the court is

summarized in the syllabus of such case, as follows:

"(4) Taxes on gross receipts, rather than on net income, are justified upon the ground of convenience in administration and because of the close relation of the volume of transactions in a business to cost of its supervision and protection by government.

"(5) The fact that the tax is levied for the specific purpose of relieving conditions (unemployment) to which the utilities taxed bear no special relation, does not render it unconstitutional."

In *Broadhead* v. *Borthwick,* 37 Haw. 314 (1945-1946), which was affirmed by the circuit court of appeals, ninth circuit, 174 F. (2d) 21 (which was not further reviewed because certiorari was denied, 338 U. S. 847), the constitutionality of the Hawaii "general excise tax law" popularly known as the "gross income tax act" has been decided and sustained as being nondiscriminatory, because measured by the application of rates against values, gross proceeds of sales or gross income, as the case may be, and not within the constitutional prohibition merely because in its incident it might indirectly reach a federal instrumentality, or indirectly affect the United States government or its departments or agencies through an economic effect merely consequential and remote and not immediate or direct.

Also, in *Yerian* v. *Territory,* 35 Haw. 855, affirmed 130 F. (2d) 786, it was held that a grant of exemption from taxation is never presumed, the presumption is the other way; nor may exemptions be created from inference drawn from doubtful language or mere silence; and the burden of showing the act of the legislature is unconstitutional is upon the party asserting it.

As was said by Peters, J., in the opinion of the supreme court of Hawaii in the *Yerian case, supra:*

"The power of the Territory to tax is extremely broad. With certain exceptions with which we are not concerned, it is equally as broad as that possessed by the States. The exercise of the right to tax is an exercise of an attribute of sovereignty. 'All subjects over which the sovereign power of the State extends, are objects of taxation.' These subjects (of taxation) are persons, property, and business.' "

In the opinion of the circuit court of appeals, ninth circuit, in this same case, the court, by Mathews, circuit judge, said:

(1) "Nor is it material, if true, that appellant will derive no benefit from the expenditure of moneys realized from the tax imposed" * * * .

"Jurisdiction to impose a tax does not depend upon the receipt by the taxpayer of the benefit therefrom."

The trial court in the instant case found that the tax assessed and involved herein was wholly upon receipts from broadcasts that were wholly intrastate, to wit, from broadcasts from KPOA's standard band only and:

"* * * in so far as places outside the Territory of Hawaii are concerned, KPOA's broadcasts on its standard band do not afford effective or satisfactory service that measure up to the standards for commercial coverage"; and, further, "* * * the complainants have not shown * * * that this 2½ percent gross income tax, which everybody in the Territory pays, not only the radio stations but everybody else, is such a burden upon the station as to interfere with its operation. * * * *"

we make a like finding from the same evidence and hold that the tax assessed was neither upon proceeds from interstate commerce, nor a burden on interstate commerce, and the factual situation in the instant case did not involve interference with the exercise of the full regulatory power

of the Federal government over radio broadcasting.

In the *Minnesota Rate Cases,* 230 U. S. 352, cited by the complainants, Mr. Justice Hughes, in delivering the opinion of the court, quite fully reviewed the many cases which to the date of the decision therein, June 9, 1913, had involved and disposed of issues as to the national powers, the extent and limitation of exercise thereof by and pursuant to enactments by the Congress, on the one hand, and the powers of a State and the exercise thereof by the latter, in fields in which there was, could be, or should not be, conflicting action, to wit, with respect to commerce, such as wholly interstate commerce, intrastate commerce closely connected with or directly affecting interstate commerce, wholly intrastate commerce, or internal affairs of a State, relating to, but either not affecting, or not being a burden upon, or interfering with, interstate commerce.

Therefore, although the opinion was the determination of controversies with respect to regulation of rates and tariffs of railways, we consider as being quite pertinent to the instant case the extract therefrom (pp. 432-433) which is as follows:

"The interblending of operations in the conduct of interstate and local business by interstate carriers is strongly pressed upon our attention. It is urged that the same right-of-way, terminals, rails, bridges, and stations are provided for both classes of traffic; that the proportion of each sort of business varies from year to year and, indeed, from day to day; that no division of the plant, no apportionment of it between interstate and local traffic, can be made to-day, which will hold to-morrow; that terminals, facilities and connections in one State aid the carrier's entire business and are an element of value with respect to the whole property and the business in other States; that securities are

issued against the entire line of the carrier and cannot be divided by States; that tariffs should be made with a view to all the traffic of the road and should be fair as between through and short-haul business; and that, in substance, no regulation of rates can be just, which does not take into consideration the whole field of the carrier's operations, irrespective of state lines. The force of these contentions is emphasized in these cases, and in others of like nature, by the extreme difficulty and intricacy of the calculations which must be made in the effort to establish a segregation of intrastate business for the purpose of determining the return to which the carrier is properly entitled therefrom.

"But these considerations are for the practical judgment of Congress in determining the extent of the regulation necessary under existing conditions of transportation to conserve and promote the interests of interstate commerce. If the situation has become such, by reason of the interblending of the interstate and intrastate operations of interstate carriers, that adequate regulation of their interstate rates cannot be maintained without imposing requirements with respect to their intrastate rates which substantially affect the former, it is for Congress to determine, within the limits of its constitutional authority over interstate commerce and its instruments the measure of the regulaton it should supply. It is the function of this court to interpret and apply the law already enacted, but not under the guise of construction to provide a more comprehensive scheme of regulation than Congress has decided upon. Nor, in the absence of Federal action, may we deny effect to the laws of the State enacted within the field which it is entitled to occupy until its authority is limited through the exertion by Congress of its paramount constitutional power."

164

A contention of the complainants in the instant case is to the effect that radio broadcasting of KPOA is such an interblending of interstate and local business that no apportionment of it between the interstate and the local can be made; and that, in substance, no tax assessment on gross receipts therefrom can be just, which does not take into consideration the whole field of the radio broadcasting of KPOA, irrespective of territorial boundaries; and that assessment of a gross income tax of the Territory of Hawaii on any receipts from said broadcasting is unconstitutional and invalid, because of the "Commerce Clause" of the Federal Constitution and the preempting by the Congress of the control and regulation of all broadcasting and, as incidental thereto, the financial aspects thereof, to wit, consideration—by the Federal Communications Commission—and requirement of a showing of financial status and responsibility of the ownership as a prerequisite to the issuance of a license to a broadcasting station, and that such precludes such taxation by the Territory as is involved herein.

Comparing such contention of the complainants herein with the substance of what is said in the first paragraph of the hereinbefore quoted extract from the opinion of Mr. Justice Hughes in the *Minnesota Rate Cases, supra,* an analogy is apparent.

Wherefore, we apply to the instant case the substance of the pronouncement made by Mr. Justice Hughes in the second paragraph of the hereinbefore quoted extract from the said opinion by him. Doing so, and being mindful of what was also said by Chief Justice John Marshall, in the *Gibbons* v. *Ogden case, supra,* to the effect that there is no analogy between the power of taxation and the power of regulating commerce, we hold, accordingly—it appearing

to us that there has been lack of Federal action in the field of taxation with respect to radio broadcasting—that, "in the absence of Federal action," effect may not be denied to the "gross income tax" law of the Territory as applied in the instant case, "within the field" which the Territory "is entitled to occupy until its authority is limited through the exertion by Congress of its constitutional power."

We also hold that the requirement of showing of financial status and responsibility of ownership as a prerequisite to the issuance of a license to a broadcasting station is nothing more than an incident of exercise of power of control and regulation, and not an exertion of any Federal constitutional power of taxation; for upon such showing, *inter alia,* the Federal Communications Commission may predicate its necessary determination of, whether, prospectively, the issuance of a license to the station would * * * "generally encourage the larger and more effective use of radio in the public interest; * * *" In this connection see *Federal Comunications Commission* v. *Sanders Bros.,* 60 S. Ct. 693, 309 U. S. 470, at 475.

The *National Broadcasting Company case, supra,* was an appeal from a judgment of the District Court of the United States for the Southern District of New York, dismissing a suit to enjoin enforcement of chain broadcasting regulations promulgated by the Federal Communications Commission.

Mr. Justice Frankfurter delivered the opinion of the court. The following quotations are excerpts therefrom (p. 214):

"Section 1 of the Communications Act states its 'purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, a

rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges.' Section 301 particularizes this general purpose with respect to radio: 'It is the purpose of this Act, among other things, to maintain the control of the United States over all the channels of interstate and foreign radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority, and no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license.' To that end a Commission composed of seven members was created, with broad licensing and regulatory powers."

In effect, the opinion affirmed the action of the lower court in holding that its inquiry was limited to review of the evidence before the Commission; that *trial de novo* of the matters heard by the Commission and dealt with in its report would have been improper; that the Communications Act provided a standard of the "public interest, convenience, or necessity," as a guide to the commission and denial by the latter of a station license on that ground, if valid under the Act, would not be a denial of free speech. (Mr. Justice Murphy delivered a dissenting opinion, with which Mr. Justice Roberts agreed; and Mr. Justice Black and Mr. Justice Rutledge took no part in the consideration or decision of the case.)

Although the case recites the history of radio and the progress of its regulation and recognizes that the latter is now entrusted to the Commission set up by the Communications Act of 1934, it deals wholly with the subject of *regulation* and control and does not touch upon any question of taxation and, therefore, does not appear applicable

or authoritative in the instant case of KPOA with respect to the levy by the Territory of Hawaii of a tax on gross income wholly derived from intrastate business.

An earlier case—cited by both the complainants and the tax commissioner—is that of *Fisher's Blend Station, Inc.* v. *State Tax Commission, et al.,* 297 U. S. 650, an appeal from the Supreme Court of Washington, argued March 9, 1936, and decided March 30, 1936, which involved two broadcasting stations, under single ownership, the broadcasts of both of which reached the listening public in several States.

It presented the question whether a state occupation tax, measured by the gross receipts from radio broadcasting from stations within the State, was an unconstitutional burden on interstate commerce. One of the stations was licensed to operate with power and a radio frequency enabling it to broadcast throughout the "fifth zone," comprising eleven western and northwestern States, including Washington, and the Territories of Alaska and Hawaii. The other was licensed to operate as a "clear channel" station, to which the Federal Comunications Commission had assigned a radio frequency to be used at such times and with such power as would enable it to broadcast throughout the United States without interference by other stations. These stations broadcast over the areas for which they were licensed, and the adjacent high seas and a part of Canada.

The appellant's entire income consisted of payments to it by other broadcasting companies or by advertisers for broadcasting, from its Washington stations, advertising programs originating there or transmitted to them from other States by wire. Appellant sold time to its customers at stipulated rates, during which it broadcasted from its

stations such advertising programs as may have been agreed upon. During such time as was not sold, it broadcasted, at its own expense, "sustaining" programs, as required by the regulations of the Federal Radio Commission.

The decisive element in said *Fisher's Blend case* was that the tax was levied on gross receipts from appellant's entire operations, which included interstate commerce, and that it did not appear that any of the taxed income was allocable to intrastate commerce. Wherefore it was held that the tax must fail. See last two sentences (p. 656) of the opinion of the court therein, as delivered by Mr. Justice Stone.

Included in a paragraph (p. 655) of the said opinion by Justice Stone are these sentences:

"* * * The essential purpose and indispensable effect of all broadcasting is the transmission of intelligence from the broadcasting station to distant listeners. It is that for which the customer pays. By its very nature broadcasting transcends state lines and is national in its scope and importance—characteristics which bring it within the purpose and protection, and subject it to the control, of the commerce clause."

The complainants in the instant case have stressed and relied greatly upon such above quoted portion of the opinion and have construed same to be a holding that "all" broadcasting is interstate and within the purview of the Federal Comunications Act for taxation as well as control and regulation, regardless of the sphere of commercial value of such broadcasting. They seem to have overlooked what we consider apparent, that Mr. Justice Stone was referring to "characteristics" of broadcasting "which bring it within the purpose and protection, and subject it to the

control of the commerce clause."

It must be assumed that the quoted portion of the opinion was predicated upon the factual situation—that the stations involved were actually engaged in broadcasts which were interstate—and related thereto.

Despite the contention of the complainants herein, as aforesaid and also to the effect that the decision of the *Fisher's Blend case* has been misinterpreted by state courts, we believe that Mr. Chief Justice Brice of the supreme court of New Mexico (August 11, 1947), in *Albuquerque Broadcasting Co.* v. *Bureau of Revenue,* 51 N. M. 332, 184 P. (2d) 416, expressed a correct view in delivering the opinion of his court, from which we quote as follows: ·

"As we understand, it is not held in the Fisher's Blend case that all broadcasting is interstate commerce, but that as the tax was levied on the gross income, which included that from interstate commerce, it followed that it was an unauthorized tax levied on interstate commerce."

That there is a demarcation between interstate and intrastate commerce in the exercise of power and authority *for regulation* and *for taxation,* respectively, has been recognized and declared by the United States Supreme Court. In the opinion of the court, by Mr. Justice Frankfurter, in *Kirschbaum* v. *Walling,* 316 U. S. 517, at pages 520 and 521, this was said:

"The body of Congressional enactments regulating commerce reveals a process of legislation which is strikingly empiric. The degree of accommodation made by Congress from time to time in the relations between federal and state governments has varied with the subject matter of the legislation, the history behind the particular field of regulation, the specific terms in which the new reg-

ulatory legislation has been cast, and the procedures established for its administration. See, e.g., Virginian Ry. Co. v. Federation, 300 U. S. 515. Thus, while a phase of industrial enterprise may be subject to control under the National Labor Relations Act, a different phase of the same enterprise may not come within the 'commerce' protected by the Sherman Law. Compare, for example, United Leather Workers v. Herkert, 265 U. S. 457, and Levering & Garrigues Co. v. Morrin, 289 U. S. 103, with Labor Board v. Friedman-Harry Marks Clothing Co., 301 U. S. 58, and Labor Board v. Fainblatt, 306 U. S. 601. Similarly, enterprises subject to federal industrial regulation may nevertheless be taxed by the States without putting an unconstitutional burden on interstate commerce. Compare Heisler v. Thomas Colliery Co., 260 U. S. 245, and Oliver Iron Co. v. Lord, 262 U. S. 172, with Sunshine Coal Co. v. Adkins, 310 U. S. 381.

"We cannot, therefore, indulge in the loose assumption that, when Congress adopts a new scheme for federal industrial regulation, it thereby deals with all situations falling within the general mischief which gave rise to the legislation. Such an assumption might be valid where remedy of the mischief is the concern of only a single unitary government. It cannot be accepted where the practicalities of federalism—or, more precisely, the underlying assumptions of our dual form of government and the consequent presuppositions of legislative draftsmanship which are expressive of our history and habits—cut across what might otherwise be the implied range of the legislation. Congress may choose, as it has chosen frequently in the past, to regulate only part of what it constitutionally can regulate, leaving to the States activities which, if isolated, are only local. * * * "

Conversely, in *Binderup* v. *Pathe Exchange*, 263 U. S. 291, 311, in the opinion of the court by Mr. Justice Sutherland, it was said:

"* * * It does not follow that because a thing is subject to state taxation it is also immune from federal regulation under the Commerce Clause."

What Mr. Justice Frankfurter has said, in the case of *Kirshbaum* v. *Walling, supra,* appears to us to be quite pertinent to the Federal Communications Act. Thus, enterprises subject to Federal control and regulation of radio broadcasting "may nevertheless be taxed by the States without putting an unconstitutional burden on interstate commerce." The "loose assumption" should not be indulged in that by adoption of the scheme for federal control and regulation of communications, inclusive of radio broadcasting—to wit, by enactment of the Federal Communications Act—Congress "thereby deals with all situations falling within the general mischief which gave rise to the legislation." The general mischief which gave rise to such legislation was the confusion and interference which occurred when there was lack of a national and uniform scheme of control and regulation. "Congress may choose, as it has chosen frequently in the past, to regulate only part of what it constitutionally can regulate, leaving to the States activities which, if isolated, are only local."

We believe that the Congress chose and acted accordingly in the enactment of the Federal Communications Act, and that to imply that such includes a greater range than that of regulation and control of communications either wholly transcending, or which contribute to such as transcend, the boundaries of a single State or Territory, and which may, therefore, be classified as "interstate," and that the Act is also an assumption and exertion of the

power of taxation to such an extent as to preclude exer-
cise by a State or Territory of its inherent—sovereign—
right of taxation of "activities," which, "if isolated, are
only local," is unwarranted. It cannot be accepted where
the practicalities of federalism—or, more precisely, the
underlying assumptions of our dual form of government
and the consequent presuppositions of legislative drafts-
manship which are expressive of our history and habits—
cut across what might otherwise be the implied range of
the legislation."

Upon such premise, we hold that neither distance at
which emanations are receivable, nor classification for
control and regulation, but the sphere of actual commer-
cial value, is the criterion for determination of whether
broadcasting is "intrastate," or, "interstate," and accord-
ingly is within or without the purview of the "Commerce
Clause" and the scope of exercised federal power there-
under otherwise than for control and regulation.

In the instant case, the trial court has found, from the
evidence—as we do, likewise—that assessment of the Ter-
ritory's gross income tax involved was restricted to re-
ceipts of KPOA from the latter's local business, to wit,
that which had commercial value only within and not
without the Territory of Hawaii. The assessment of the
tax was, therefore, rightful and valid.

We concur in the finding of the trial court that the
radio broadcasting of KPOA on its "standard wave" was,
for other than control and regulation, such as had com-
mercial significance and value only within the Territory
of Hawaii, or "intrastate," but, even though such broad-
casting was, as complainants herein have contended, "all"
interstate—presumably because of its "characteristics"
bringing it within the purpose and protection, and subject

to the control of the commerce clause"—the complainants have failed to prove, and the proof is otherwise than, that the tax as assessed would constitute either a direct or any burden upon interstate commerce; or was on other than what would be apportioned intrastate business; so as assessed the tax would nevertheless be rightful and valid.

Upon reading the opinions of the appellate courts in cases which presented for consideration the taxability by States of activities in or incidental to commerce, or the proceeds of the business thereof, it is noticeable that in such as held a state tax invalid the crux, or determinative factor, was a factual one, to wit, that the activity assessed was, or the proceeds assessed were from an activity which was, actual participation in, or a contributing element to and closely connected with, interstate—or foreign—commerce to such extent that levy of the tax would be prejudicial to a continuous flow of, interefere with, or be a direct or an undue burden upon, the interstate—or foreign—commerce and thus be contra to, or interference with, the paramount constitutional power of the federal government to control, regulate and protect the interstate—or foreign—commerce.

Examples are: *KVL, Inc.* v. *Tax Commission of Washington, et al.,* 12 Fed. Supp. 497; *Fisher's Blend Station, Inc.,* v. *State Tax Commission, et al., supra; Joseph* v. *Carter and Weekes,* 330 U. S. 422, wherein a New York City tax on gross income from stevedoring was held invalid because "stevedoring obviously a 'continuation of the transportation'" (interstate and foreign); *Freeman* v. *Hewit,* 329 U. S. 249, 256, 67 S. Ct. 274, 279; *Spector Motor Service, Inc.* v. *O'Connor,* 340 U. S. 602; State Freight Tax, 15 Wall. 232.

Particularly pertinent to what has been said in the last

preceding paragraph hereof—and also, to and refutatory of complainants' asignments of error 28 to 32, inclusive, are the two paragraphs of the opinion of the court, by Mr. Justice Frankfurter, in *Freeman* v. *Hewit, supra,* p. 251, which are as follows:

"The power of the States to tax and the limitations upon that power imposed by the Commerce Clause have necessitated a long, continuous process of judicial adjustment. The need for such adjustment is inherent in a federal government like ours, where the same transaction has aspects that may concern the interests and involve the authority of both the central government and the constituent States.

"The history of this problem is spread over hundreds of volumes of our Reports. To attempt to harmonize all that has been said in the past would neither clarify what has gone before nor guide the future. Suffice it to say that especially in this field opinions must be read in the setting of the particular cases and as the product of preoccupation with their special facts."

See also the recent case of *City of Chicago* v. *Willett Company,* 344 U. S. 574 (decided February 9, 1953) and the cases which are referred to and commented upon therein. Also, note, particularly, the pronouncement therein made (at page 578) which is quoted below.

"* * * the taxpayer here makes no showing that the tax, though directed at intrastate business only, in fact burdens interstate commerce. This is for the taxpayer to show affirmatively and respondent has made no attempt to do so."

That pronouncement is peculiarly applicable to the complainants herein, who have had the burden to show affirmatively but have made no showing that the herein

involved tax, being one assessed upon intrastate business only, in fact burdens interstate commerce.

The tax involved in the instant case is imposed by section 5455 of chapter 101 of the Revised Laws of Hawaii 1945, as amended by Acts 100 and 253 of the Session Laws of Hawaii 1945, and Acts 111 and 113 of the Session Laws of Hawaii 1947, reading in pertinent parts as follows:

"Sec. 5455. *Imposition of Tax.* There is hereby levied and shall be assessed and collected annually privilege taxes against the persons on account of their business and other activities in this Territory measured by the application of rates against values, gross proceeds of sales or gross income, as the case may be, as follows:

\* \* \*

"D. *Tax upon theaters, amusements, radio, broadcasting stations, etc.* Upon every person engaging or continuing within this Territory in the business of operating a theater, opera house, moving picture show, vaudeville, amusement park, dance hall, skating rink, radio broadcasting station or any other place at which amusements are offered to the public, the tax shall be equal to two and one-half per cent of the gross income of the business."

The tax is upon the business of radio broadcasting "within this Territory," measured by the gross income of such business. This excludes broadcasts between points in the Territory and points outside the Territory. (*Pacific Express Company* v. *Seibert,* 142 U. S. 339, 350.)

The tax commissioner has assessed the tax accordingly by excluding therefrom receipts of KPOA from short-wave relays being broadcasts between points in the Territory and points outside the Territory and by including and thus subjecting to the tax only receipts of the station from its "standard wave" broadcasts, which latter are of commercial value only within and not outside the Territory.

We hold that as thus limited and restricted, the assessment of the tax would be and was within the power of the Territory, not an encroachment upon any assumed and exerted federal power under the "Commerce Clause" of the national Constitution, not a burden upon interstate commerce, and rightful and valid. (See *Pacific Tel. and Tel. Co.* v. *Tax Commision, supra; Ratterman* v. *Western Union,* 127 U. S. 411, and also other cases *supra.*)

Although, as we have said, *supra,* the complainants' assignment of error number 33 has been waived by the noninclusion thereof in their specifications of error—and, also, their failure to present either argument or authorities pertinent thereto—but, nevertheless, to avoid any possible uncertainty which might arise because of our failure to consider whether interest and penalties should be added to a delinquent tax, we declare that the rule of law is that interest and penalty shall be added to a tax lawfully payable, whenever there has been failure to pay such tax when due, and same has become delinquent, the interest and penalty automatically following the former pursuant to statutory provisions. (Section 5463, Revised Laws of Hawaii 1945, as amended by Act 253 of the Session Laws of Hawaii 1945.)

Further, there is a well-established rule that where a tax law provides for penalties and interest, one who contests the tax does so in peril of the penalties and interest, and is liable for penalties and interest upon such amount unpaid as is found to be legally due.

See *Spencer* v. *Babylon R. R. Co.,* 250 Fed. 24 (2 C. C. A.), a case arising in New York; *Washington Water Power Co.* v. *Kootenai County,* 270 Fed. 369, as modified 273 Fed. 524 (9 C. C. A.), a case arising in Idaho; *State of California* v. *Hisey,* 84 F. (2d) 802, 805 (9 C. C. A.); *State* v. *Holly Sugar Corp.,* 57 Wyo. 272, 116 P. (2d) 847; *State*

v. *Great Atlantic and Pacific Tea Co.,* 190 La. 925, 183 So. 219, *cert. denied* 305 U. S. 637; *Citizens' Waterworks* v. *Hughes,* 362 Ill. 136, 199 N. E. 265, and *People ex rel Stuckart* v. *Chicago etc. Ry. Co.,* 270 Ill. 477, 110 N. E. 720; *Brittain & Henry* v. *Robertson,* 120 Miss. 684, 83 So. 4, and *Hamel* v. *Marlow,* 171 Miss. 559, 157 So. 905; *Rixeys Executors* v. *Commonwealth,* 125 Va. 337, 99 S. E. 573, 101 S. E. 404; *Power* v. *City of Detroit,* 139 Mich. 30, 192 N. W. 288; *Western Union Tel. Co.* v. *State,* 64 N. H. 265, 9 Atl. 547, and *Winnipiseogee Lake Mfg. Co.* v. *Gilford,* 64 N. H. 514, 15 Atl. 137; *Cedar Rapids & M. R. Co.* v. *Carroll County,* 41 Iowa 153, 191; *Jaggar* v. *David,* 121 Kan. 737, 250 Pac. 260.

Incidentally, as penalties and interest for nonpayment of tax automatically follow the latter as a matter of statutory enactment, same are not within or subject to the control or the discretion of any administrative—inclusive of the Attorney General—or judicial officer. (*Citizens' Water Works* v. *Hughes, supra.*)

As we have also said, *supra,* the complainants' specification of error number 9 and assignment of error number 8, are deemed to have been abandoned or waived. Such were not argued by complainants. However, as the decision and the judgment of the trial court provided for recovery by the tax commissioner of sums inclusive of not only the taxes assessed, but penalties and interest in addition thereto, pursuant to the tax commissioner's counterclaim, to avoid any possible uncertainty as to whether in affirming and sustaining said decision and judgment we have considered such items and passed upon the validity thereof and of the counterclaim, we declare that we have done so and hold, not only that there has been failure on the part of the complainants to show error by the trial court in the allowance of said items and of the said coun-

terclaim, but also, affirmatively, that the counterclaim was an allowable pleading and the allowance thereof and of the said items was proper under the pleadings and otherwise. (See § 10476, R. L. H. 1945; *Wright* v. *Borthwick,* 34 Haw. 245, 255; *Great Northern Insurance Company* v. *Reed,* 322 U. S. 47; *Ford Co.* v. *Department of Treasury,* 323 U. S. 459; also *Wong Nin* v. *City and County,* 33 Haw. 379; *Kinney* v. *Aguiar,* 34 Haw. 213, 220; §§ 10087-10094 of c. 204, and §§ 10475, 10476 of c. 220, R. L. H. 1945.)

The assignments of error and the contentions of the complainants have not been sustained. The assertions made and submitted by the tax commissioner in the several paragraphs numbered "L," "II," "A," "B," "C," "D," "E," "F," "G," "III," "IV," "V," "VI," and "VII," quoted and fully set forth in early pages hereof— all vindicative of the action of the trial court—are supported by more than a scintilla of material evidence and by the law of the case, as same appears from the authorities cited. Wherefore, our conclusion is that the decision and judgment of the trial court, and each respectively, should be, and they are, *supra,* affirmed.

*D. N. Ingman* (*D. Davis* with him on the briefs) for complainants-plaintiffs in error.

*Rhoda V. Lewis,* Deputy Attorney General (also on the briefs), for tax commissioner, respondent-defendant in error.